(C.D. 2064)

W. C. SULLIVAN & COMPANY v. UNITED STATES

United States Customs Court, Second Division

(Decided January 30, 1959)

*Wallace & Schwartz* (*Barnes, Richardson & Colburn* by *Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Henry J. O'Neill,* trial attorney), for the defendant.

Before Lawrence, Rao, and Ford, Judges; Lawrence, J., dissenting

Ford, Judge: The two protests enumerated above were consolidated for purposes of trial and determination. The merchandise covered thereby is described in the entry papers as railway car parts.

The collector of customs classified the merchandise as "Manufactures of metal, nop," under paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and imposed duty thereon at the rate of 22½ per centum ad valorem.

Plaintiff contends that the merchandise, with the exception of an item described as "flashings," should be classified as structural shapes and dutiable at the rate of 7½ per centum ad valorem, as provided for in paragraph 312 of said act (19 U.S.C. § 1001, par. 312), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739. Plaintiff's protests also claim the merchandise to be properly dutiable under the provisions of paragraph 372 of said act (19 U.S.C. § 1001, par. 372), as modified by the Torquay protocol to said general agreement, *supra*, which claim plaintiff states in its brief "is not here pressed" and is, therefore, deemed abandoned.

The pertinent text of the statutes under consideration is here set forth:

Paragraph 397, as modified by the General Agreement on Tariffs and Trade, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Other (except slide fasteners and parts thereof)_____ 22½% ad val.

Paragraph 312, as modified by the Torquay protocol to said general agreement, *supra*:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

    Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_ 7½% ad val.

The substance of the testimony of James S. Swann, called on behalf of the plaintiff, the only witness called to testify in the case, discloses that he is chief engineer of the Standard Railway Equipment Mfg. Co. of Hammond, Ind., the actual importer of the merchandise in controversy. The company manufactures railway specialties, such

as refrigerator car parts, roofs, ends, uncoupling devices, and doors for cars, but not complete cars. The witness acquired his engineering education at "a Chicago technical college, Armour Institute of Technology, and extension courses from Wisconsin University," where he studied the subject of structural shapes, structural steel, and machines. During the 39 years that he had been associated with the company, he had been engaged as a tracer in the drafting room, a draftsman, a checker, chief draftsman, assistant chief engineer, development engineer, and chief engineer—in the latter for 12 years in charge of the engineering department.

The merchandise in dispute is more specifically described in plaintiff's brief by a reference to invoice descriptions and entry numbers as follows:

| Description | Entry No. |
| --- | --- |
| The hatch carline and skirt assemblies, appearing on the invoices as "either carline and combing assembly" or "carline and skirt assemblies with hatch comb assembly." | 8735 6760 |
| Flues, sometimes described on the invoice as flues or side flues. | 9243 6760 9672 |
| End flues, sometimes described on the invoice as flues. | 8720 6760 9672 |
| Tank ends. | 8720 |
| Steel floor and troughs. | 6760 |
| Overhead ice tank. | 6760 |
| Ice tank bottoms. | 6760 |
| Solid steel roof. | 6760 |
| Tank covers. | 9672 |

The merchandise in the foregoing tabulation was described by the witness as being made according to specifications, composed of structural steel, and formed in hydraulic and mechanical presses which produce stiffening ribs and flanges which increase their overall strength. It was also stipulated by and between counsel that none of the imported articles herein contains any of the alloys enumerated in paragraph 305 of the Tariff Act of 1930.

The witness then proceeded to describe the function of the individual imported items. The hatch carline and skirt assemblies are part of the complete roof assembly of a refrigerator car and are fastened to the sides of said car. This assembly has an opening to provide for the introduction of ice through the roof into the ice tanks and also lends support to the roof to keep the car from spreading.

The side and end flues carry air down to the floor and up through the load. In addition, the side flues help support the ice tanks suspended from the underside of the roof.

The ice tank bottoms and ice tank ends are parts which form the complete ice tank, while the tank cover is an integral part of the tank which is designed to resist deflection due to splashing of the water and ice.

The steel floor and troughs were described by the witness as follows:

\* \* \* the steel floor is used to support the lading, or merchandise, and also it is a steel floor to resist the corrosion of any brine, which we call salt and water, that has been melted, which might get down on the floor and damage other types of material. The troughs are adjacent the side walls of the car, and are used to carry the brine to a drain.

The solid steel roof is used for the purpose of weatherproofing the car, as well as being a means of keeping the sides of the car from spreading, due to shifting loads.

The question presented to the court in this matter is whether the certain parts for railroad refrigerator cars enumerated, *supra*, fall within the purview of the terms "structural shapes," contained in paragraph 312 of the Tariff Act of 1930.

Our understanding of the provisions for structural shapes in paragraph 312, *supra*, is that the iron or steel item must be used or be capable of being used in a structure. The evidence in the case at bar establishes that the imported items were designed and made according to specification for use in railroad refrigerator cars. While a railroad refrigerator car may in a sense be a structure, we do not believe this type of structure was intended to be included by Congress in enacting the provisions of paragraph 312, *supra*.

Our appellate court, in the case of *Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T.D. 40490, had before it for consideration the proper classification of the main and auxiliary driving rods for locomotives, which were claimed to be, among other things, properly dutiable under paragraph 312 of the Tariff Act of 1922 as "all other structural shapes of iron or steel." The court, in holding such rods not to be properly dutiable under the structural shapes provisions of the Tariff Act of 1922, stated as follows:

Paragraph 312 for all other structural shapes of iron or steel, clearly does not apply to parts of a locomotive, since it can not be said that a railway locomotive is a structure so as to bring it within the term "all other structural shapes of iron or steel." In the case of Simon, Buhler & Baumann *v.* United States (8 Ct. Cust. Appls. 273; T.D. 37537), the court held that the merchandise consisting of steel channel irons, steel bars, frames, plates, etc., all ready to be assembled into a mash filter, was such "structural shapes of iron or steel" for the reason that the mash filter was a structure and not a manufacture of metal.

In a subsequent case involving so-called snubbers, *The Frost Railway Supply Co.* v. *United States*, 39 C.C.P.A. (Customs) 90, C.A.D. 469, the court cited with approval the *Myers* case, *supra*.

Based upon the judicial interpretation evidenced in the above cases and the subsequent reenactment of the structural shapes provision

in the Tariff Act of 1930, we believe such action to be legislative approval of judicial interpretation. We are, therefore, of the opinion that the imported parts are not structural shapes, since they are not parts of a recognized structure, as that term has been judicially determined and as it is used in relation to structural shapes.

Even if it be assumed that a railroad refrigerator car is a structure, the individual parts are not, in our opinion, structural shapes.

The imported article described as "steel floors" and used for the purpose of flooring for the refrigerator box car seems to fall squarely within the decision of *Amerlux Steel Corp.* v. *United States*, 18 C.C.P.A. (Customs) 449, T.D. 44700. In the *Amerlux* case, the appellate court held certain checkered, or raised diamond, steel plates, used as floorings in buildings, boiler rooms, and engine rooms, not to be structural shapes under paragraph 312 of the Tariff Act of 1922, based upon the decision of *Hill* v. *Wood & Co.*, 163 Fed. 51. It would, therefore, appear that the involved steel floors are not any more or less a structural shape than those involved in the *Amerlux* case, *supra*, which the evidence established were actually used in a structure.

The merchandise referred to as "carline and combing assembly," which is also referred to as "carline and skirt assemblies with hatch comb assembly," as well as the solid steel roof, are by the same token, in our opinion, not structural shapes. The testimony of the witness that the roof prevents the spreading of the car is not convincing, since there are railroad cars which do not have roofs, such as a coal car. While the roof may prevent some spreading, it is obvious that its primary function is that of protection of the merchandise carried by the car from the elements, and the prevention of spreading is incidental to its primary purpose.

The case of *Otis McAllister & Co.* v. *United States*, 27 C.C.P.A. (Customs) 4, C.A.D. 52, appears to clearly cover material such as the steel roof involved herein. In the *McAllister* case, *supra*, certain corrugated sheets, used as sidings and roofs on buildings, were held not to be structural shapes. The court, in arriving at this conclusion, stated as follows:

Of course there can be no question but that a roof covering which is always fastened to beams of some character and the sidings which are likewise attached to the upright studding must, of necessity, lend strength, in some degree, to the structure in which they are placed.

It is also true that in constructing buildings the roof must have a load carrying capacity and likewise that the sides must be able to withstand the stress of wind and weather. We are convinced, however, that as to load carrying and wind resistance the elements of the building designed to function in these respects is not the coverings but the framework. The record does not disclose that the sheets of themselves are designed to carry a building load or stress. * * * We are convinced that any strength that may be incorporated in a structure by the use of the imported merchandise is at best incidental.

The fact that the hatch assembly has to be reinforced does not *per se* make it a structural shape.

Certainly, a trough used to carry brine to a drain could not, in our opinion, be considered a structural shape, nor would the flues which carry air into the car, even though they also support the tank. To include flues, solely on the basis that they support the tank, would render any iron or steel article capable of support, a structural shape. Steel strapping, which is utilized in many instances to support weight, would automatically fall within the designation of structural shapes. This would appear contrary to congressional intent, as well as the common meaning of the terms.

The case of *Standard Railway Equipment Mfg. Co.* v. *United States,* 16 Cust. Ct. 10, C.D. 976, held certain side flues which were incorporated in railroad refrigerator cars to be structural shapes within the meaning of paragraph 312, *supra.* It appears from the decision in the *Standard Railway Equipment Mfg. Co.* case, *supra,* that the evidence adduced therein was to the effect that the side flues involved in that case were utilized as a substitute for a diagonal brace which would strengthen the superstructure. The record in the instant case is barren of such evidence and, in fact, indicates that the flues merely help support the tanks suspended from the underside of the roof. Since the record in the *Standard Railway Equipment Mfg. Co.* case, *supra,* is not incorporated herein and the record in the instant case does not contain such evidence, we do not feel the court should presume the existence of such facts in the case at bar. We are, therefore, of the opinion that the *Standard Railway Equipment Mfg. Co.* case, *supra,* is distinguishable on the record.

By the same token, the tanks, tank ends, and tank bottoms, although they support the weight of the water and brine contained in the finished tank, are not, in our opinion, structural shapes; nor do the tank covers which merely deflect the splashing of water and ice fall within the purview of structural shapes.

It is oftimes said that in cases involving structural shapes each case must stand on its own facts. The cases cited by the parties which have not been referred to, *supra,* while they relate to the general question of structural shapes and are of assistance, are not determinative of the question presently before the court.

For the reasons heretofore stated and in line with the authorities quoted and cited, it is our considered opinion the involved merchandise should be held dutiable under paragraph 397 of the Tariff Act of 1930, as modified, *supra,* at 22½ per centum ad valorem, as classified by the collector of customs.

The protests are, therefore, overruled and judgment will be rendered accordingly.

DISSENTING OPINION

Lawrence, Judge: Upon the authority of *Standard Railway Equipment Mfg. Co.* v. *United States*, 16 Cust. Ct. 10, C.D. 976, and the unrefuted testimony of the witness Swann, I am constrained to dissent from the decision and judgment of the majority as to all the refrigerator car parts in controversy, with the possible exception of the item described as "Steel floor and troughs."

I do not regard the case of *Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T.D. 40490, wherein the court expressed the opinion that a railway locomotive is not a "structure," an authority for the view taken by the majority herein that a railway refrigerator car is not a "structure," as that term was treated in the *Standard Railway* case, *supra*. Steam locomotives which are self-motivating mechanisms have been given special treatment by Congress, being provided for by name in paragraph 372 of the Tariff Act of 1930.